Estate of Mary Louise Selecman, Deceased, Charles L. Selecman, Administrator v. Commissioner.
Estate of Mary Louise Selecman v. Commissioner
Docket No. 21085.
United States Tax Court
1950 Tax Ct. Memo LEXIS 52; 9 T.C.M. (CCH) 997; T.C.M. (RIA) 50267; November 6, 1950
Harry G. Taylor, Esq., Miami, Fla., for the petitioner. William W. Oliver, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency of $3,117.58 in estate tax against the Estate of Mary Louise Selecman. The question for determination is whether or not one-half of the agreed value of the two apartments owned by the decedent and her husband at the date of her death and held by them by the entirety, constituted a part of her gross estate. Findings of Fact Mary Louise Selecman, a resident of Miami Beach, Florida, died intestate on October 26, 1944, and Charles L. Selecman is the duly appointed administrator of her estate. The estate tax return was filed with *53 the Collector of Internal Revenue for the District of Florida, on November 20, 1945. The decedent and Charles L. Selecman were married in or about 1906. At that time, neither had a separate estate of any substantial amount. After purchasing some furniture, they had left twenty-two dollars and some cents. Selecman and the decedent lived together as husband and wife until her death, on October 26, 1944. Helen A. Selecman, later Shenstone, was their only child. The decedent was never engaged in business or gainfully employed after her marriage, and at all times was fully supported by her husband. At or about 1915, the decedent and Selecman moved to Roseburg, Oregon, where Selecman was employed in a real estate and timber development project. The advent of the First World War ended this operation, and he and the decedent returned to the East. In or about 1920, Selecman obtained an interest in a valuable coal lease in West Virginia. The venture was profitable, and from the profits realized, he made gifts to his wife and daughter, up to around eight or nine thousand dollars each. to his wife and daughter. These gifts ranged in amount Over the years, Selecman made a practice of making *54 gifts of money to his wife and daughter. These gifts ranged in amount from one hundred dollars to the eight or nine thousand dollars given from the West Virginia coal mining profits. The decedent would deposit the money so received by her from her husband in a joint bank account, which they maintained. At no time did they maintain separate bank accounts. From time to time, the decedent would make investments from the money her husband had given her, and at times he made investments for her; sometimes a "little" house, here and there, and, at other times, stocks and securities. Among the securities purchased were B. & O. bonds and Standard Oil Company stock, and securities of that character. From these investments the decedent had some income, and on her investment transactions she at times made money and at times lost money. Over the years Selecman's judgment on investments was good and the over-all result was a profit. Early in 1925, the Selecmans moved to Miami Beach, Florida, and, shortly after their arrival, plans were made for the formation of a realty business, to be known as Selecman Construction Company, Inc. Its capital stock amounted to $50,000, all of which was issued *55 and owned by the decedent, Selecman and their daughter, and Selecman's two sisters, Lillie Selecman and Margaret Davis. Selecman, the decedent and their daughter each owned $14,500 par value of stock, or 29 per cent, each. Lillie Selecman had $5,000 par value of stock, or 10 per cent, and Margaret Davis had $1,500 par value of stock, or 3 per cent. At the time Selecman Construction Company, Inc., was organized and the stock was subscribed and paid for, the decedent and the daughter, then Helen Shenstone, each had property, possibly securities, or property and cash, approximating $35,000. With the $50,000 received from stock subscriptions, the corporation purchased land in Miami and began a building program. Two apartment houses, the Michigan and the Arundell, were constructed and furnished. The total cost of the Michigan, including land, building and furnishings, was approximately $90,000, and that of the Arundell approximately $98,000. Funds in addition to the $50,000 of corporate capital were needed to complete construction of the two apartment houses. Of the funds needed, the decedent and Helen Shenstone each loaned $20,000 to the venture. Lillie Selecman loaned $9,000, and *56 Margaret Davis, $3,000. A further loan of $10,000 was obtained from a cousin of Selecman's. Additional amounts were advanced by Selecman, all or a part of which was borrowed by him on his personal note. A comparatively short time after the apartments were completed, the Arundell was sold, the terms of the sale being $5,000 in cash, with the remainder to be paid at stated intervals. The hurricane of 1926 did substantial damage to both apartment buildings. The purchaser of the Arundell failed to make repairs, and Selecman Construction Company, Inc., expended $9,600 therefor. Because of the purchaser's failure to make the necessary repairs, and because he also defaulted in payments on the purchase price, the corporation instituted foreclosure proceedings. Subsequently, a compromise was reached and the proceedings were dropped, in consideration of a cash payment of $2,500 by the corporation to the purchaser, the corporation receiving clear title to the property and the purchaser relinquishing any and all claims to prior payments toward the purchase price, which approximated $40,000. From the payments which had been received on the purchase price of the Arundell, the loan of $10,000 *57 from Selecman's cousin was paid. The corporation never paid the loans made to it by the decedent, Helen Shenstone and Lillie Selecman. [1]
The corporation's business of owning and operating its apartment properties suffered from the collapse of the so-called Florida land boom and the subsequent general business depression in the early 1930's. During the depression, the Selecman family was just able to obtain a living out of their share of the proceeds from the corporation's operations. At a date not disclosed, the corporation acquired some lots on *58 the beach adjacent to the apartment houses. The purchase price of approximately $9,000 was paid by the corporation. In 1935, Selecman and the decedent were desirous of obtaining the apartment house properties for themselves. They reached an agreement with Helen Shenstone, Lillie Selecman and Margaret Davis, whereby they would pay for the interests of these three, amounts equal to the stock and loan investments of each. For the three interests, they gave notes in a total amount of $53,320, [2] after which the corporation was liquidated and Selecman and the decedent took title to the apartment house properties by the entirety. At some time subsequent to the liquidation of the corporation, Selecman and the decedent purchased some Everglades property, totaling 40 acres, at a cost of $600. On the estate tax return of Mary Louise Selecman, *59 the apartment house properties were reported as jointly owned and at a value of $47,822. Debts of the decedent were listed at $53,320, and shown as demand notes held by H. A. Shenstone, Mrs. Lillie Selecman and Margaret Davis, of $37,820, $14,000 and $1,500, respectively. The net estate was shown as "none." In his determination of the deficiency herein, the respondent has determined a value of $140,000 for the Arundell Apartment and $96,000 for the Michigan, and has further determined that one-half of the value so determined constitutes a part of the decedent's gross estate. He has allowed as a deduction for debts one-half of the notes held by Helen Shenstone, Lillie Selecman and Margaret Davis, plus one-half of the interest accrued thereon to the date of death. Of the total cost of the two apartment house properties to the decedent and Selecman, the part contributed by decedent which did not originally belong to Selecman, and was never received or acquired by her from him, was one-third. Opinion The petitioner does not take issue with the respondent's determination of value of the two apartment house properties at the date of the decedent's death. Neither is issue taken with *60 his determination as to the amount of the decedent's deductible indebtedness. It is the petitioner's claim, however, that, except for one-half of the interests of Helen Shenstone, Lillie Selecman and Margaret Davis, acquired by the decedent and her husband by joint purchase, the entire interest of the decedent in the apartment house properties represented property which originally belonged to Selecman, and [was] never received or acquired by her, from him, for adequate and full consideration in money or money's worth, within the meaning of section 811 (e) of the Internal Revenue Code, [3] and that under that section does not constitute a part of her gross estate. More definitely stated, the contention of the petitioner is that only 21 per cent of the value of the two properties at the date of the decedent's death is includible in her estate and that all of the remaining value is excludable, under section 811 (e), supra. The percentage is arrived at by taking note of the fact that Helen Shenstone, Lillie Selecman and Margaret Davis, whose interests were jointly purchased by the decedent and Selecman, originally subscribed for and owned 42 per cent of the stock *61 of Selecman Construction Company, Inc., which in turn owned the two properties. The petitioner was able to offer no books of account for Selecman, Mary Louise Selecman, or the Selecman Construction Company, Inc. The story of the origin of the moneys and the history thereof which went into the acquisition of the land, the construction of the buildings *62 and the purchase of the furnishings of the two apartment houses, came solely from the recollections of Selecman and of his cousin. They were, in the main, broad, general remembrances, and at times Selecman, who supplied most of the details which were given, gave statements which were confusing when related to other statements and, at other times, when definite information would have been most helpful, was only able to state broad and general conclusions. We are convinced, and have found, that at the time the apartment venture was initiated, both Helen Shenstone, the daughter, and Mary Louise Selecman, the decedent, had individual estates approximating $35,000 each and that the beginnings of these holdings were gifts of money made by Selecman to them. As to the decedent, however, there does not appear to have been any actual taking of the money at the time the formality of making the gifts was indulged in. She and Selecman at all times maintained a joint bank account and any moneys which she had on hand, or received, went into that account. We do not know how much money Selecman gave to her. Over a period of years he made gifts of [from] one hundred dollars to several hundred dollars, *63 and from the West Virginia coal mine operation, he gave her eight or nine thousand dollars. There is no way of knowing whether the total gifts amounted to $12,000, $15,000, $20,000, $30,000, or some other figure. We have no way of knowing how much of those gifts were consumed by Mary Louise Selecman for various purposes in the course of every day events, prior to the time of their investment, or how much of the proceeds of investments made from time to time were so expended. We do know, however, that at intervals she had investments in real estate and in stocks and bonds, such as B. & O. Railroad bonds and Standard Oil Company stock, and that she had some earnings therefrom and realized some profits thereon. She also had some losses. Generally, however, it seems clear that she was able to build up her holdings and that the result of her operations was a net gain, rather than a net loss. Selecman's general testimony was that his direction of investments must have generally brought a gain, or they ("we") would not have been in the position in which they were in 1925. From the above, it is accordingly apparent that the amount of the decedent's investments which did not originate from *64 Selecman is not definitely determinable and that the case here is a case to which the rule of Cohan v. Commissioner, 39 Fed. (2d) 540, is applicable. The petitioner concedes that 21 per cent of the value of the properties is includible in the decedent's gross estate, by reason of the purchase by Selecman and the decedent, on their joint demand notes, of the 42 per cent stock interest which Helen Shenstone, Lillie Selecman and Margaret Davis had in the Selecman Construction Company, Inc. The petitioner makes no allowance for any further portion of the interest owned by the decedent at her death as representing the earnings received, over the years, from her investments. Under the rule laid down in Estate of Ralph Owen Howard, 9 T.C. 1192, dividends received by one spouse on shares of stock received by gift from the other spouse are not, under section 811 (e), supra, to be regarded as having originally belonged to the spouse from whom the stock was received. Applying the rule in the Cohan case, it is our conclusion, and we have so found, that one-third of the cost of the apartment house properties to Selecman and the decedent was contributed by decedent and *65 did not originally belong to Selecman, and, as a consequence, one-third of the value of the properties at her death is a part of her gross estate and is not to be excluded by reason of the provisions of section 811 (e), supra. Decision will be entered under Rule 50. Footnotes
1. As to repayment of advances made by Selecman, the record is not at all clear. Some, if not all, of his advances were made from money borrowed on his personal note. At one place his testimony is that all outside loans were repaid, presumably from the property. At another place his testimony might possibly have meant that to the extent loans were made from his personal funds they were never repaid, although at that time his testimony had been directed to advances made by his wife, daughter and two sisters, and not to any loans he may have made. With reference to the $3,000 loan from Margaret Davis, see a footnote which follows.↩
2. There is testimony that the $3,000 loan from Margaret Davis was never paid by the corporation. The note received by her from Selecman and the decedent, however, was for only $1,500, the amount paid by her for stock. In the case of Helen Shenstone, the note received was $3,820 more than the $34,500 representing her stock and $20,000 loan.↩
3. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(e) Joint Interests. - To the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: * * *↩